IN THE UNITED STATES DISTRICT COURT FOR THE
MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | | |
|---|---|---|
| THUNDER ROADS MAGAZINE/THUNDER PUBLISHING, LLC, | ) ) ) ) | |
| Plaintiff, | ) ) | NO. 3:23-cv-00395 |
| v. | ) ) | JUDGE RICHARDSON |
| DEREK A. SMITH, | ) ) ) | |
| Defendant. | ) | |

## **MEMORANDUM OPINION**

Thunder Roads Magazine/Thunder Publishing, LLC ("Plaintiff") initiated this lawsuit by filing a Verified Complaint (Doc. No. 1-2, "Complaint") in the Chancery Court of Cheatham County, Tennessee ("Chancery Court"). The Complaint includes a claim for breach of contract against Defendant Derek Smith ("Defendant"). (Doc. No. 1-2 at ¶¶ 1, 43-47).[1] Plaintiff seeks damages (including punitive damages) as well as injunctive relief.[2] (Doc. No. 1-2 at 14-15).[3] On April 21, 2023, Defendant filed a Notice of Removal to this Court. (Doc. No. 1).

---

[1] When citing to a page in a document filed by one of the parties, the Court endeavors to cite to the page number ("Page __ of __") added by the Clerk's Office as part of the pagination process associated with Electronic Case Filing if such page number differs from the page number originally provided by the author/filer of the document. When citing to the Complaint, however, the Court endeavors to cite to the specific paragraph of the Complaint, rather than the page number.

[2] In addition to requesting injunctive relief in its Complaint, Plaintiff filed a motion for a preliminary injunction (Doc. No. 21) and an amended motion for preliminary injunction (Doc. No. 22), three months after Defendant filed the instant Motion.

[3] Although the Court generally cites to the specific paragraph of the Complaint, rather than the page number, when citing to the Prayer for Relief or documents attached to the Complaint, the Court cites the page number as it would with any other document.

Now pending before the Court is Defendant's "Motion to Dismiss" (Doc. No. 16, "Motion") seeking to dismiss Plaintiff's action under Fed. R. Civ. P. 12(b)(6) for failure to state a claim upon which relief can be granted. The Motion is supported by a memorandum of law (Doc. No. 17). Plaintiff filed a response in opposition to the Motion (Doc. No. 20, "Response").

<u>BACKGROUND</u>

**Facts[4]**

Plaintiff is a magazine distributor owned by Tony McCoy Shearon and Brian Shearon ("the Shearons"). (Doc. No. 1-2 at ¶ 7). Although it is based in Tennessee, Plaintiff distributes its magazine, "Thunder Roads," across multiple states through distributorship agreements which allow publishers to create and distribute *Thunder Roads* magazines in a particular state. (*Id*. at ¶ 8). Through the Shearons,[5] Plaintiff provides each publisher with tools related to publishing a magazine such as form letters, files, and training regarding selling advertising space before the publisher begins publishing a *Thunder Roads* magazine in the publisher's respective state. (*Id*. at ¶¶ 9-10).

In or around 2012, Plaintiff and Defendant entered into a contract ("the Agreement") with Defendant for Defendant to publish the *Thunder Roads Ohio* magazine.[6] (*Id*. at ¶ 15). Defendant

---

[4] The facts herein are taken from the Complaint at Doc. No. 1-2, which is the operative complaint in this case. For purposes of the instant Motion, the facts in the Complaint are accepted as true, except to the extent that they are qualified herein (as for example by "Plaintiff alleges") to denote that they are not being taken as true but instead are set forth merely to make clear what a party claims to be true. Throughout this opinion, the Court forgoes any such qualifiers for any fact that it is accepting as true, stating those facts without qualification even though it is aware that any such (alleged) fact ultimately might not prove to be true.

[5] As a practical matter, Plaintiff has acted only through the Shearons, who founded the company in 1999 and, by all accounts, have maintained complete control over Plaintiff's operations, with the important exception of contracting with publishers to create and distribute *Thunder Roads* magazines for certain states. (Doc. No. 1-2 at ¶ 8).

[6] To be clear, "*Thunder Roads Ohio*" refers to the version of *Thunder Roads* magazine that is published in the state of Ohio. As previously mentioned, Plaintiff distributes its magazines across multiple states through

published the magazine for several years in Ohio, while receiving guidance from Plaintiff regarding sales pitches for advertisers, basic invoicing, and any additional information that might assist Defendant in creating the magazine. (*Id*. at ¶¶ 9, 21). In 2019, while still a publisher for Plaintiff, Defendant started placing a logo titled *Reasons to Ride* on the *Thunder Roads Ohio* magazines despite the fact that *Reasons to Ride* is not affiliated with Plaintiff in any way. (*Id*. at ¶¶ 22-23). Plaintiff informed Defendant that this logo "could not touch" the Thunder Roads logo[7] on the magazine cover,[8] to which Defendant replied, "it's just a cross promotion with an event website." (*Id*. at ¶ 23).

In September 2022, at a bike rally, Defendant sold *Reasons to Ride* t-shirts at a booth at which he also sold *Thunder Roads Michigan* magazines, and sold advertising space in *Reasons to Ride* magazine at a different booth. (*Id*. at ¶ 29). Shortly thereafter, Defendant published the October 2022 magazine for *Thunder Roads of Ohio*, which had a *Reasons to Ride* logo on the front page and contained a letter from the publisher. (*Id*. at ¶ 31). That letter stated that *Thunder Roads Ohio* had "partnered with ReasonstoRide.com" in order to be "the most complete online resource for riders in Ohio." (*Id*.). In addition to the *Reasons to Ride* logo, Defendant also added a statement to the bottom of subsequently published *Thunder Roads Ohio* magazines that the magazine was "Powered by ReasonsToRide.com." (*Id*. at ¶ 33).

---

distributorship agreements with publishers in those states. For example, the *Thunder Roads* magazine published in the state of Michigan is called "*Thunder Roads Michigan*." (*See* Doc. No. 1-2 at ¶ 29). Therefore, when the Court refers to a magazine called "*Thunder Roads*," followed by the name of a particular state, it refers to the version of Plaintiff's magazine that is published in that particular state.

[7] The Court surmises that when Plaintiff refers to the "Thunder Roads logo" it intends to refer to the words "Thunder Roads" that are shown in all capital letters and bold font across the top of its magazines, as depicted in the photo attached to the Complaint. (*See* Doc. No. 1-2 at ¶ 33).

[8] Without purporting to state exactly what Plaintiff means when it uses the phrase "could not touch," in this context, the Court interprets this to mean that there had to be a discernible space (gap) between the two logos.

Around this same time in October 2022, Defendant began publishing *Reasons to Ride* magazines in Michigan using the "editorial design, content, and likeness of Thunder Roads."[9] (*Id.* at ¶ 34).

In response to Defendant's actions, on October 7, 2022, Plaintiff sent Defendant a Cease and Desist via certified mail, notifying Defendant that he had breached the Agreement. (*Id.* at ¶¶ 37-38). Nevertheless, Defendant continued to publish his *Reason to Ride* magazines and to promote them in Ohio. (*Id.* at ¶ 41).

**Procedural History**

Plaintiff filed this lawsuit on February 10, 2023 in the Chancery Court. (*Id.*). The Chancery Court issued an *ex parte* temporary injunction[10] restraining Defendant "from violating the non-compete provisions of the Agreement (attached to the Complaint) by his affiliation and association with Thunder Roads, LLC's direct competitor, Reasons to Ride." (Doc. No. 1-3). The injunction was entered on March 6, 2023 (*id.*) and served on Defendant on March 23, 2023 (Doc. No. 1-4).

---

[9] The Complaint includes several examples of illustrations comparing the layout of portions of certain monthly *Thunder Roads* magazine to the layout of portions of Defendant's *Reasons to Ride* magazine. (*Id.* at ¶ 34). For present purposes, the Court accepts the accuracy of such illustrations.

[10] Although titled "*Ex Parte* Temporary Injunction" in the Chancery Court's order (Doc. No. 1-3) and characterized as a "temporary injunction" by the parties, the relief granted by the Chancery Court appears in substance to have been a temporary restraining order (TRO)—a distinction that is important to determining when and how the injunction expires. The Court draws this conclusion for two reasons. First, Plaintiff specifically requested that the Chancery Court grant a TRO "pursuant to Tenn. R. Civ. P. 65.03," which governs temporary restraining orders (as opposed to Tenn. R. Civ. P. 65.04, which governs temporary injunctions). (Doc. No. 1-2 at ¶ 49). Second, the "*Ex Parte* Temporary Injunction" was issued without notice to the adverse party, which the Tennessee Rules of Civil Procedure allow for a TRO but not for a temporary injunction. *Compare* Tenn. R. Civ. P. 65.03(1) (permitting the court to issue a temporary restraining order "without written or oral notice to the adverse party or its attorney" if certain criteria are met) *with* Tenn. R. Civ. P 65.04(1) ("No temporary injunction shall be issued without notice to the adverse party"). Thus, to the extent the Court evaluates whether the "*Ex Parte* Temporary Injunction" issued by the Chancery Court has expired, the Court treats it as a TRO.

A hearing on the matter was scheduled for May 18, 2023 (Doc. No. 1-3), but before the hearing

could occur, on April 21, 2023, Defendant filed a Notice of Removal to this Court. (Doc. No. 1).[11]

The Complaint alleges that Defendant has breached, and continues to breach, the

Agreement by "owning, managing, promoting, and publishing Reasons to Ride, a direct competitor

of [Plaintiff], and infringing on [Plaintiff's] name and logo in the Reasons to Ride magazine."

(Doc. No. 1-2 at ¶ 45). Plaintiff seeks compensatory and punitive damages for Defendant's alleged

breach of contract. In addition to seeking damages, Plaintiff seeks an "temporary injunction"—but

not a permanent injunction, as far as the Complaint indicates—against Defendant that would

---

[11] The parties dispute whether the "*ex parte* temporary injunction" issued by the Chancery Court remains in effect post-removal, given that removal occurred prior to the Chancery Court's scheduled hearing on the matter. As the Court explained in a footnote above, the relief granted by the Chancery Court is more accurately characterized as a TRO, granted pursuant to Tenn. R. Civ. P. 65.03, rather than a temporary injunction. With respect to the duration of a TRO, Tenn. R. Civ. P. 65.03(5) states

> Every temporary restraining order granted without notice shall expire by its terms within such time after entry, not to exceed fifteen days, as the court fixes, unless within the time so fixed the order, for good cause shown, is extended for a like period, or unless the party against whom the order is directed consents that it may be extended for a longer period.

It appears from the Chancery Court's order granting the TRO that the TRO was extended beyond the fifteen-day maximum for good cause, such that the TRO would remain in effect until a hearing could occur on May 18, 2023. (Doc. No. 1-3). Of course, that hearing never occurred because the case was removed to federal court on April 21, 2023. (Doc. No. 1). But under these circumstances, the act of removal does not serve to extend the TRO beyond the May 18, 2023 hearing date set by the Chancery Court. As the Supreme Court has held

> An ex parte temporary restraining order issued by a state court prior to removal remains in force after removal no longer than it would have remained in effect under state law, but in no event does the order remain in force longer than the time limitations imposed by Rule 65(b), measured from the date of removal.

*Granny Goose Foods, Inc. v. Bhd. of Teamsters & Auto Truck Drivers Local No. 70 of Alameda Cnty.*, 415 U.S. 423, 439-40 (1974).

Under Fed. R. Civ. P. 65(b), a TRO may not exceed 14 days from entry. Here, Defendant filed a Notice of Removal on April 21, 2023. (Doc. No. 1). Thus, based on the Supreme Court's holding in *Granny Goose*, the TRO issued by the Chancery Court would have expired no later than May 5, 2023 (14 days measured from the date of removal). Accordingly, the Court agrees with Defendant that the *ex parte* temporary injunction (TRO) issued by the Chancery Court is no longer in effect.

prohibit him from violating what the Complaint calls the Agreement's "non-compete provisions." (*Id*. at 14-15).

LEGAL STANDARD

For purposes of a motion to dismiss under Fed. R. Civ. P. 12(b)(6), the Court must take all of the factual allegations in the complaint as true. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face. *Id*. A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. *Id*. Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice. *Id*. When there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief. *Id*. at 679. A legal conclusion, including one couched as a factual allegation, need not be accepted as true on a motion to dismiss, nor are mere recitations of the elements of a cause of action sufficient. *Id*.; *Fritz v. Charter Twp. of Comstock*, 592 F.3d 718, 722 (6th Cir. 2010), *cited in Abriq v. Hall*, 295 F. Supp. 3d 874, 877 (M.D. Tenn. 2018). Moreover, factual allegations that are merely *consistent* with the defendant's liability do not satisfy the claimant's burden, as mere consistency does not establish *plausibility* of entitlement to relief even if it supports the *possibility* of relief. *Iqbal*, 556 U.S. at 678.

In determining whether a complaint is sufficient under the standards of *Iqbal* and its predecessor and complementary case, *Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007), it may be appropriate to "begin [the] analysis by identifying the allegations in the complaint that are not entitled to the assumption of truth." *Iqbal*, 556 U.S. at 680. This can be crucial, as no such allegations count toward the plaintiff's goal of reaching plausibility of relief. To reiterate, such allegations include "bare assertions," formulaic recitation of the elements, and "conclusory" or

"bold" allegations. *Id*. at 681. The question is whether the remaining allegations—factual allegations, *i.e.*, allegations of factual matter—plausibly suggest an entitlement to relief. *Id*. If not, the pleading fails to meet the standard of Federal Rule of Civil Procedure 8 and thus must be dismissed pursuant to Rule 12(b)(6). *Id*. at 683.

As a general rule, matters outside the pleadings may not be considered in ruling on a motion to dismiss under Rule 12(b)(6) unless the motion is converted to one for summary judgment under Rule 56. Fed. R. Civ. P. 12(d). When a document is referred to in the pleadings and is integral to the claims, it may be considered without converting a motion to dismiss into one for summary judgment. *Doe v. Ohio State Univ.,* 219 F.Supp.3d 645, 652-53 (S.D. Ohio 2016); *Blanch v. Trans Union, LLC*, 333 F. Supp. 3d 789, 791-92 (M.D. Tenn. 2018).

On a Rule 12(b)(6) motion to dismiss, "[t]he moving party has the burden of proving that no claim exists." *Total Benefits Plan. Agency, Inc. v. Anthem Blue Cross and Blue Shield,* 552 F.3d 430, 433 (6th Cir.2008). To put it only slightly differently, "[a] Rule 12(b)(6) movant 'has the burden to show that the plaintiff failed to state a claim for relief.'" *Willman v. Att'y Gen. of United States*, 972 F.3d 819, 822 (6th Cir. 2020) (quoting *Coley v. Lucas Cnty*., 799 F.3d 530, 537 (6th Cir. 2015)).That is not to say that the movant has some *evidentiary* burden; as should be clear from the discussion above, evidence (as opposed to *allegations* as construed in light of any allowable matters outside the pleadings) is not involved on a Rule 12(b)(6) motion. The movant's burden, rather, is a burden of *explanation*; since the movant is the one seeking dismissal, it is the one that bears the burden of explaining—with whatever degree of thoroughness is required under the circumstances—why dismissal is appropriate for failure to state a claim.

<u>DISCUSSION</u>

## I.      Breach of Contract

Plaintiff's sole cause of action is for breach of contract. The elements of a breach-of-contract claim include "(1) the existence of an enforceable contract, (2) nonperformance amounting to a breach of the contract, and (3) damages caused by the breach of the contract." *C & W Assets Acquisition LLC v. Oggs*, 230 S.W. 3d 671, 676–77 (Tenn. Ct. App. 2007).[12]

Plaintiff asserts that Defendant breached two separate provisions of the Agreement. First, Plaintiff claims that Defendant breached what Plaintiff calls the "non-compete provisions" of the Agreement found in Section 17 by publishing his own magazines (*Reasons to Ride*) in direct competition with Plaintiff's (*Thunder Road Ohio*). (Doc. No. 1-2 at ¶ 45). Second, Plaintiff claims that Defendant breached Section 15 of the Agreement by infringing upon Plaintiff's name and logo, which Defendant included in his *Reasons to Ride* magazines. (*Id*. at ¶¶ 16, 45). Defendant argues in response that what Plaintiff calls the Agreement's "non-compete provisions" has expired according to its terms and that in any event it is unenforceable under Tennessee law because it is not reasonably limited in scope and does not serve to protect any legitimate business interest. (Doc. No. 17 at 4-5). Defendant also argues that Plaintiff has failed to plausibly allege that Defendant

---

[12] The Sixth Circuit has explained:

> In diversity cases such as this, we apply state law in accordance with the controlling decisions of the state supreme court. If the state supreme court has not yet addressed the issue presented, we must predict how the court would rule by looking to all the available data. *See id.* "Relevant data include decisions of the state appellate courts, and those decisions should not be disregarded unless we are presented with persuasive data that the [state] Supreme Court would decide otherwise." *Kingsley Assoc. v. Moll PlastiCrafters, Inc.,* 65 F.3d 498, 507 (6th Cir.1995).

*Allstate Ins. Co. v. Thrifty Rent-A-Car Sys., Inc.*, 249 F.3d 450, 454 (6th Cir. 2001) (citation omitted). Herein, when the Court cites a decision of the Tennessee Court of Appeals, it does so with confidence that the State Supreme Court today would not decide differently with respect to the cited proposition(s).

has infringed on Plaintiff's name and logo in violation of Section 15 of the Agreement. (*Id*. at 5). The Court addresses below the sufficiency of the allegations with respect to each provision.

A.  *The Agreement's* So-Called *Non-Compete Provision*

The Complaint alleges that Defendant breached the Agreement by violating a non-compete provision found in Section 17. (Doc. No. 1-2 at ¶¶ 16, 45). Defendant argues, however, that this non-compete is unenforceable under Tennessee law and that therefore Plaintiff has failed to state a claim upon which relief can be granted. (Doc. No. 17 at 4-5). Plaintiff responds that, taking the alleged facts as true, it has sufficiently pled the enforceability of the non-compete provision. (Doc. No. 20 at 6).

Section 17 of the Agreement states, with numerous unnecessary commas, one semi-colon that should be a comma, and one unnecessary "that":

> [Defendant], specifically agrees to a Covenant not to Compete with [Plaintiff]. [Defendant], agrees that should said person(s) executing this contract, default in this contract, that [Defendant], shall not compete with [Plaintiff] in any state, city, county or country, (with specifics to the state they were previously publishing in), in any form or capacity; either publicly or behind the scenes, for a period of not less than five (5) years.

(Doc. No. 1-2 at 24). Below, the Court refers to this specific provision (referred to by Plaintiff as the Agreement's "non-compete provisions," as noted above) as the "Non-Compete," and refers more generally to a contractual term prohibiting particular competitive activities as a "non-competition provision."

The parties first argue about the proper time period over which the Non-Compete extends. Defendant offers two potential interpretations of the Non-Compete as it relates to its applicable duration. First, Defendant asserts that the Non-Compete extended only five years from the date he executed the Agreement (October 9, 2012), and that therefore it expired in October 2017, well before Defendant engaged in the conduct that forms the basis for Plaintiff's breach-of-contract

claim. (Doc. No. 17 at 4-5). Alternatively, Defendant asserts what the Court herein will call Defendant's "two-part interpretation," which is to be distinguished from Defendant's above-referenced "one-part interpretation." (*Id*. at 5). Specifically, Defendant argues that the Non-Compete may be split into two parts, with each part creating a separate non-competition provision, each of which (according to Defendant) is unenforceable. (*Id*.). Under Defendant's two-part interpretation, the first sentence of Section 17 creates a non-competition provision ("purported first-sentence non-compete") that is in effect during the term of the Agreement (a term left undefined by the Agreement) and the second sentence creates a second non-competition provision ("purported second-sentence non-compete") that comes into effect following a material breach of the Agreement and lasts for at least five years after said breach. (*Id*.). Under Defendant's two-part interpretation, the term of the purported first-sentence non-compete is co-terminous with the term of the Agreement—and, because the term of the Agreement is undefined, so too (according to Defendant) is the term of the purported first-sentence non-compete.[13] (*Id*.). As for the second-sentence non-compete, Defendant asserts that it runs for a period of five years following a breach (meaning, apparently, the first breach) of the Agreement. (*Id*.).

In response, Plaintiff argues that the Non-Compete prescribes only a single non-competition provision, one that takes effect for a period of five years upon a breach of the Agreement. (Doc. No. 20 at 3-4). Notably, though unsurprisingly, each party's respective interpretation(s) would, if adopted, strategically serve(s) to bolster the party's litigative position in

---

[13] In asserting that the Agreement may continue for an "indefinite time period" because the term of the Agreement (and, in turn, the term of the purported first-sentence non-compete) is "not defined," Defendant equates the term "indefinite" with "not defined" or "undefined." (Doc. No. 17 at 5). Put differently, the gist of Defendant's argument in favor of his construction of the purported first-sentence non-compete is that because the term of the Agreement is undefined, it could (in theory) go on forever. And, because the term of the first-sentence non-compete is equal to the length of the Agreement, the first-sentence non-compete provision could also (in theory) remain in effect forever (so long as the Agreement is not terminated).

two different ways. Specifically, under Plaintiff's proposed interpretation, the Non-Compete is in effect long enough for Defendant to have violated it (thus aiding Plaintiff in establishing a violation of the Non-Compete), but shorter than it would be in effect under Defendant's two-part interpretation (thus making it easier to refute that the Non-Compete is temporally too broad to be enforceable). On the other hand, under Defendant's one-part interpretation, the Non-Compete was not in effect long enough for Defendant to have violated it (thus defeating Plaintiff's claim of a violation), and under Defendant's two-part interpretation, the Non-Compete is especially long in duration (thus making it easier to attack the Non-Compete as unenforceable due to excessive temporal breadth).

The Non-Compete is oddly drafted indeed, and it falls to the Court to construe it as best the Court can, guided by applicable principles of Tennessee law.

B. *Tennessee Law of Contract Interpretation*

"A cardinal rule of contractual interpretation is to ascertain and give effect to the intent of the parties." *Allmand v. Pavletic*, 292 S.W.3d 618, 630 (Tenn. 2009). "Courts must look at the plain meaning of the words in a contract to determine the parties' intent. If the contractual language is clear and unambiguous, the literal meaning controls; however, if the words are ambiguous, i.e., susceptible to more than one reasonable interpretation, the parties' intent cannot be determined by a literal interpretation of the language." *Id.* (internal citation omitted). "Th[e] Court's initial task in construing a contract is to determine whether the language [at issue] is ambiguous." *Planters Gin Co. v. Federal Compress & Warehouse Co., Inc*., 78 S.W.3d 885, 890 (Tenn. 2002).

"When the language of the contract is plain and unambiguous, courts determine the intentions of the parties from the four corners of the contract, interpreting and enforcing it as

written." *Union Realty Co. v. Family Dollar Stores of Tennessee, Inc.*, 255 S.W.3d 586, 591 (Tenn. Ct. App. 2007). The Tennessee Court of Appeals has explained that:

> The rights and obligations of contracting parties are governed by their written agreements. The courts must interpret these contracts as written. We are not at liberty to make a new contract for parties who have spoken for themselves, nor are we at liberty to relieve parties from their contractual obligations simply because these obligations later prove to be burdensome or unwise.

*Hillsboro Plaza Enterprises v. Moon*, 860 S.W.2d 45, 47 (Tenn. Ct. App. 1993) (internal citations omitted).

However, "[w]hen contractual language is found to be ambiguous, the court must apply established rules of construction to determine the intent of the parties." *Allstate Ins. Co. v. Watson*, 195 S.W.3d 609, 611 (Tenn. 2006). "We generally will construe ambiguous terms against the drafter. However, the courts will not rewrite an unambiguous term simply to avoid harsh results." *Ralph v. Pipkin*, 183 S.W.3d 362, 367 (Tenn. Ct. App. 2005) (internal citation omitted). The Tennessee Supreme Court has explained the circumstances under which a court should find a contractual provision to be ambiguous:

> However, on occasion, a contractual provision may be susceptible to more than one reasonable interpretation, rendering the terms of the contract ambiguous. *Planters Gin. Co.*, 78 S.W.3d at 890. "Ambiguity, however, does not arise in a contract merely because the parties may differ as to interpretations of certain of its provisions. A contract is ambiguous only when it is of uncertain meaning and may fairly be understood in more ways than one." *Johnson v. Johnson*, 37 S.W.3d 892, 896 (Tenn. 2001) (internal quotation marks and citations omitted). The court will not use a strained construction of the language to find an ambiguity where none exists. *Farmers–Peoples Bank v. Clemmer*, 519 S.W.2d 801, 805 (Tenn. 1975).

*Maggart v. Almany Realtors, Inc.*, 259 S.W.3d 700, 704 (Tenn. 2008).

When a contract is unambiguous on a particular point at issue, a court may determine the interpretation on a motion to dismiss as a matter of law, but when a contract is ambiguous, a court should not interpret the contract at the motion to dismiss stage. *See e.g.*, *McKee Foods Corp. v.*

*Pitney Bowes, Inc.*, No. 1:06-CV-80, 2007 WL 896153, at *3 (E.D. Tenn. Mar. 22, 2007) ("Where the language of the contract is clear and unambiguous, its literal meaning controls the outcome of contract disputes. In such a situation, contractual interpretation is a matter of law and may be addressed on a motion under Rule 12. When a contract's terms are ambiguous, however, interpretation is a question of fact and is not appropriately decided in the context of Rule 12." (internal citations omitted)); *Griggs v. LF Prod. PTE Ltd.*, No. 1:12-CV-00193, 2013 WL 4499131, at *4 (M.D. Tenn. Aug. 16, 2013) ("Resolution of contractual claims on a motion to dismiss is proper if the terms of the contract are unambiguous." (quotation omitted)); *Ajuba Int'l, L.L.C. v. Saharia*, 871 F. Supp. 2d 671, 689 (E.D. Mich. 2012) ("In reviewing a Rule 12(b)(6) motion to dismiss, the Court may resolve issues of contract interpretation when the contract is properly before the Court, but must resolve all ambiguities in the contract in Plaintiffs' favor. A contract is ambiguous if its words may reasonably be understood in different ways. A court should not choose between reasonable interpretations of ambiguous contract provisions when considering a motion to dismiss under Rule 12(b)(6). In other words, the construction of ambiguous contract provisions is a factual determination that precludes dismissal on a motion for failure to state a claim." (internal citations omitted and cleaned up)); *BorgWarner Ithaca LLC v. Principal Mfg. Corp.*, No. 18-CV-13970, 2019 WL 1952858, at *3 (E.D. Mich. May 2, 2019) (applying *Ajuba*); *cf. Perry v. Allstate Indem. Co.*, 953 F.3d 417, 432 (6th Cir. 2020) (Readler, J. concurring in part and dissenting in part) ("While it may be the majority view, we cannot say at this threshold stage, as did the district court, that [Defendant's] view is the only potentially reasonable interpretation of the policy language. True, as [Defendant] notes, one court's aberrant decision cannot unsettle the meaning of well-defined legal terms. But that is not what we have here. Both [Defendant] and [Plaintiff's] views have ample support. All things considered, including the somewhat detailed

discussion necessary to explain these competing views, we find that, at this stage, both views are reasonable. Under Ohio law, [Plaintiff's] claim therefore survives [Defendant's] Rule 12(b)(6) motion.").

There is also some case law that indicates (without distinguishing between ambiguous and unambiguous contracts) that it is generally inappropriate to interpret a contract on a motion to dismiss. *DeNune v. Consol. Capital of N. Am., Inc.*, No. 3:02CV7241, 2004 WL 1474653, at *2 (N.D. Ohio May 21, 2004) ("Contract interpretation is inappropriate for a motion to dismiss."); *In re Nat'l Century Fin. Enterprises, Inc., Inv. Litig.*, No. 2:03-MD-1565, 2006 WL 2849784, at *7 (S.D. Ohio Oct. 3, 2006) ("The Court, though, will not resolve a conflict in contract interpretation on a motion to dismiss."); *Exact Software N. Am., Inc. v. Infocon Sys., Inc.*, No. 3:03CV7183, 2004 WL 952876, at *5 (N.D. Ohio Apr. 16, 2004) (same). Taking a somewhat different position, the Court believes that it is appropriate to interpret a contract on a motion to dismiss—but only if the contract is unambiguous.[14]

The upshot is that the Court needs to (i) first determine whether the Non-Compete is unambiguous[15] and, (ii) if so, apply its unambiguous meaning but, if not, decline to interpret the

_____

[14] The Court's position here actually favors Defendant, because it means that Defendant at least potentially has the opportunity to convince the Court that the Non-Compete unambiguously means what Defendant says it means; Defendant would be denied even the potential for this, if the Court were to perceive an absolute prohibition of construing the Non-Compete at this juncture—a prohibition that necessarily would mean that Plaintiff's proposed interpretation survives at this juncture.

Here, Plaintiff's interpretation prevails, but not because Defendant was denied the opportunity to convince the Court that the Non-Compete provision unambiguously means what Defendant says it means. But as noted below, Defendant prevails on his Motion even though the Court has rejected his interpretation of the Non-Compete.

[15] As indicated above, to say that language is unambiguous is to say that there is no reasonable basis for disagreeing as to its meaning. The Court is firmly convinced, however, that: (a) whether language is ambiguous can be a subjective question on which reasonable minds may differ under certain circumstances; and (b) ambiguity (or lack of ambiguity) exists on a spectrum, i.e., there is a sliding scale of ambiguity. To pose a hypothetical example, if a contract obligates one party to perform a task specifically on January 1,

contract and instead deny Defendant's Motion inasmuch as it relies on the Court interpreting the contract (in Defendant's favor).

C. *Application of Tennessee Law of Contract Interpretation to the Non-Compete*

As indicated above, it behooves the Court to first decide whether the contested contractual language is unambiguous. The Court answers that question in the affirmative. More specifically, the Court agrees with Plaintiff's interpretation and reads the Non-Compete as unambiguously creating a single covenant not to compete that unambiguously is triggered only by a breach of the Agreement and is limited to a period of five years after said breach.

To be more specific, the Court construes the Non-Compete (consistent with Plaintiff's interpretation) as follows: (a) its first sentence provides merely that Defendant agrees that some kind of non-competition provision ("Conditional Non-Competition Provision") would apply between him and Plaintiff; (b) its second sentence (i) makes clear that such agreement actually is conditional, i.e., that the Conditional Non-Competition Provision is triggered (if at all) only under certain circumstances; and (ii) identifies those circumstances, by specifying that the Conditional Non-Competition Provision is triggered when one of the parties to the Agreement "defaults in" the Agreement; (iii) provides the substance of the Conditional Non-Competition Provision, i.e., prescribes what competition by Defendant is prohibited, and where; and (iv) states how long the

_____

2024, the contract in the Court's view is at the extreme end of unambiguity on the issue of the day on which the task must be performed; there does not seem to be much subjectivity in the determination that the task must be done on "Monday, January 1, 2024"—and this reality would not be altered by the mere fact that one party might advance the interpretation that what the contract actually meant there was Tuesday, January 9, 2024. *See Johnson*, 37 S.W.3d at 896 ("Ambiguity, however, does not arise in a contract merely because the parties may differ as to interpretations of certain of its provisions. A contract is ambiguous only when it is of uncertain meaning and may fairly be understood in more ways than one.") (internal quotation marks and citations omitted). In other cases, a court might find a contract to be unambiguous on a particular issue, even if the unambiguousness is not quite as undebatable as it was in the hypothetical just provided. The Court's point here is that a contract can be declared unambiguous on a point even if one can imagine an even clearer case of unambiguousness.

Conditional Non-Competition Provision lasts (five years from the "default in" the Agreement). And, as noted, the Court finds that the Non-Compete unambiguously dictates this construction, but that even if it did not, the Non-Compete reasonably could be read to dictate this construction, such that the Court would have to adopt it for purposes of adjudicating the present Motion.

From this, it follows that on this Motion, the Court cannot accept Defendant's construction in any respect. First, the Court rejects Defendant's first proposed interpretation that the Non-Compete extended only five years from the date he executed the Agreement. Contrary to this interpretation, the first sentence of the Non-Compete unambiguously directs the reader to the second sentence to ascertain the nature of the agreed non-competition provision, and the second sentence unambiguously states that the agreed non-competition provision becomes effective only once it is triggered by a breach of the Agreement (not upon execution of the Agreement). Second, the Court rejects Defendant's two-part interpretation, whereby the first sentence creates a non-competition provision that exists during the term of the Agreement and the second sentence creates a separate non-competition provision that exists for five years following a breach of the Agreement.

Having determined that the Non-Compete prescribes a particular non-competition provision (i.e., the Conditional Non-Competition Provision) that lasts for a period of five years following a breach of the Agreement, the Court must next consider whether the Conditional Non-Competition Provision is enforceable under Tennessee law. In so doing, the Court treats the Conditional Non-Competition Provision as if it were (like many non-competition provisions) not conditional; such treatment is to Defendant's benefit, because it precludes the (unpersuasive) argument that the Conditional Non-Competition Provision somehow is less objectionable than it

otherwise might be merely because it is conditional (meaning that it, and any pernicious overbreadth it might embody, might never come into effect anyway).

"Covenants not to compete are disfavored in Tennessee. These covenants are viewed as a restraint of trade, and as such, are construed strictly in favor of the employee." *Murfreesboro Med. Clinic, P.A. v. Udom*, 166 S.W.3d 674, 678 (Tenn. 2005). However, covenants not to compete are not invalid per se. *Allright Auto Parks, Inc. v. Berry*, 409 S.W.2d 361, 363 (Tenn. 1966). "[S]uch agreements are valid and will be enforced, provided they are deemed reasonable under the particular circumstances." *Id*. Factors relevant to whether a covenant is reasonable include: (1) the consideration supporting the covenant; (2) the threatened danger to the employer in the absence of the covenant; (3) the economic hardship imposed on the employee by the covenant; and (4) whether the covenant is inimical to the public interest. *Murfreesboro Med. Clinic*, 166 S.W.3d at 678. Moreover, "it is generally agreed [that] before a noncompetitive covenant will be upheld as reasonable and therefore enforceable, the time and territorial limits involved must be no greater than is necessary to protect the business interests of the employer." *Allright Auto Parks*, 409 S.W.2d at 363.

Defendant argues that the Conditional Non-Competition Provision, which restricts Defendant from competing with Plaintiff in "any state, city, county or country" for at least five years after the Agreement is breached, is unenforceable because it does not contain a reasonable geographical limitation. (Doc. No. 17 at 5). The Court agrees. In *Allright Auto Parks*, the Supreme Court of Tennessee found to be unreasonable a non-compete provision with a far less restrictive territorial limitation. 409 S.W.2d at 365. There, an employee (the defendant) was a manager for the plaintiff employer (an automobile-parking business) in just three cities, while the plaintiff operated in 46 cities across 17 states. *Id*. at 362. The employee signed an employment contract that

contained a non-competition provision prohibiting him from competing with the plaintiff for a period of five years after the date of termination or expiration of his employment in any city in which the plaintiff operated. *Id*. Upon his resignation from the plaintiff, the (now former) employee "engaged in competition with the [plaintiff]," which resulted in the plaintiff suing the former employee for breach of contract. *Id*. The court held that the non-compete provision was unreasonable, and therefore unenforceable, because the area encompassed by the prohibition was beyond what was necessary to shield the plaintiff from unfair competition. *Id*. at 363. The court reasoned, "[t]he rule appears to be prevalent that noncompetition covenants, which embrace territory in which the employee never performed services for [the plaintiff], are unreasonable and unenforceable." *Id*. at 364.

The territorial limitation included in the Agreement here is far broader than the one held unreasonable in *Allright Auto Parks* and certainly "embrace[s] territory in which [Defendant] never performed services for [Plaintiff]." *Id*. In fact, the Conditional Non-Competition Provision's territorial limitation can hardly even be described as a limitation. After all, the Agreement prohibits Defendant from competing in "any state, city, county or country"—meaning anywhere on the planet—during the five year-period following a breach.[16]

---

[16] The Court notes the potential ambiguity created in the Non-Compete by the following text: ". . . [Defendant], shall not compete with [Plaintiff] in any state, city, county or country, (*with specifics to the state they were previously publishing in*) . . ." (Emphasis added). It is unclear to the Court how the parenthetical language was intended to qualify or otherwise affect the words immediately preceding it. And yet, Plaintiff makes no argument explaining why this language should be read to counteract what appears to be a geographical limitation that applies to "any state, city, county or country"; Plaintiff does not make, for example, the dubious (if not absurd) assertion that this language means that competition from Defendant is prohibited only in areas where Plaintiff previously was publishing its magazines. In fact, despite Defendant's clear assertion that "the noncompete is not reasonably limited geographically," (Doc. No. 17 at 5), Plaintiff makes no argument in response related to the geographical limitation. Instead, Plaintiff's Response focuses solely on the time limitation. (Doc. No. 20 at 4, 6). Given this potential ambiguity and Plaintiff's failure to explain it, the Court is inclined to follow established principles of contract construction, which dictate that "an ambiguous provision in a contract generally will be construed against the party drafting it." *Allstate Ins. Co.*, 195 S.W.3d at 612.

In addition, the Agreement does not describe the purpose of the Conditional Non-Competition Provision or otherwise explain why its extremely broad territorial limitation (which, again, can hardly be called a "limitation" at all) is necessary to protect Plaintiff's legitimate business interests, and Plaintiff has not otherwise alleged facts that, accepted as true, would be sufficient to support a conclusion that such a broad non-competition provision is necessary to protect its legitimate business interests. Plaintiff notes that the Complaint alleges that Plaintiff provided Defendant "guidance" and that "[Defendant] improperly uses his unique insight into [Plaintiff's] business model, advertising, and format gleaned from his position as publisher to compete with [Plaintiff] in violation of the Agreement." (Doc. No. 1-2 at ¶ 42). From this, Plaintiff seems to imply (without directly asserting) that the "guidance" and "insight" that Plaintiff has provided to Defendant are "legitimate business interests" that the Conditional Non-Competition Provision is necessary to protect. But even if the Court found that the "guidance" and "insight"

_____

Although the parties do not state which party drafted the Agreement, the Court finds from the following facts that Plaintiff drafted the Agreement (and must be treated as so doing for present purposes): the Agreement is titled "Thunder Publishing, LLC And/Or Thunder Roads Magazine Contract" (Doc. No. 1-2 at 17); (2) certain words in the Agreement, including each mention of Defendant's name ("Smith") and terms specific to this particular contract (such as dates and dollar amounts) appear underlined suggesting this was a standardized contract form, which included blank spaces for the parties to plug in specific terms, and which Plaintiff used to contract with its other distributors, (*see*, *e.g.*, Doc. No. 1-2 at 17, 20); and (3) in several paragraphs, the Agreement refers to Defendant using the second-person point of view (*see id.* at 23 ("You are NEVER permitted to just use the Thunder Roads, Thunder Road, or Thunder Roads Magazine registered/trademarked name . . ."); *Id.* at 24 ("You must assure Thunder Publishing that all material being used is in a completely legal manner and agree to hold harmless Thunder Roads Magazine from any and all legal actions . . . that may arise from the . . . publishing of any such above item as provided by you as a State Editor/Owner.")). Confident that this attachment to the Complaint leaves little or no doubt that the Agreement was drafted by Plaintiff—even while recognizing that it must resolve doubts at this stage in Plaintiff's favor— the Court therefore construes this ambiguity (to the extent any exists) against Plaintiff and interprets the language to create an overly broad and unreasonable geographical limitation.

In short, Plaintiff does not dispute or refute that the Conditional Non-Competition Provision unambiguously prescribes a boundless geographic scope of the prohibition against competition. And to the extent that the quoted text is properly deemed to inject ambiguity into such scope, the ambiguity must be resolved against Plaintiff, such that the Court is in any event relegated to treating the geographic prohibition as boundless.

that Defendant received from Plaintiff are "legitimate business interests" of Plaintiff worthy of protection by *a* non-competition provision,[17] the Complaint does not include allegations sufficient to support the notion that the *Conditional Non-Competion Provision*—which extends even to states and countries in which the Court has no reason to believe Plaintiff even engages in business— is "reasonably necessary to protect those interests." *See Allright Auto Parks*, 409 S.W.2d at 363. In other words, although non-compete provision including a narrower geographic limitation could (in theory) be found reasonably necessary to protect Plaintiff's purported business interests, the breadth of the Conditional Non-Competition Provision (because of its unreasonably broad territorial limitation, or lack thereof) simply cannot be characterized as "necessary to protect [Plaintiff's purported] business interest[s]." *See Murfreesboro Med. Clinic,* 166 S.W.3d at 678.

Accordingly, the Court concludes that the Conditional Non-Competition Provision is unreasonable, and thus unenforceable, because Plaintiff has not alleged facts sufficient to show that the broad territorial limitation it contains (if it can be called a limitation at all) is no greater than necessary to protect Plaintiff's legitimate business interests. Plaintiff has therefore failed to plausibly state a claim that Defendant breached the Agreement by violating terms of the (unenforceable) Non-Compete.

i.     *Breach of Contract by Infringement*

Plaintiff also claims that Defendant has breached the Agreement by infringing Plaintiff's name and logo in Defendant's *Reasons to Ride* magazine in violation of Section 15 of the

---

[17] As the Supreme Court of Tennessee noted in *Hasty v. Rent-A-Driver, Inc*., 671 S.W.2d 471 (Tenn. 1984), the "numerous cases" addressing which business interests are "legitimate" and therefore entitled to protection by a non-competition provision "are not entirely reconcilable to each other." *Id*. at 473. For reasons stated above, the Court need not parse through this at least somewhat irreconcilable caselaw to determine whether the "guidance" and "insights" provided to Defendant by Plaintiff are "legitimate business interests" of Plaintiff entitled to such protection—although the Court questions whether a party can have an ongoing "interest" in something (here, "guidance" and "insight") once it has been given by the party to someone else (here, from Plaintiff to Defendant).

Agreement. (Doc. No. 1-2 at ¶ 45). In support of this claim, the Complaint asserts that the *Reasons to Ride* magazine that Defendant published (and continues to publish) included "the editorial design, content, and likeness of Thunder Roads." (*Id*. at ¶ 34). The Complaint includes several examples of illustrations comparing the layout of portions of certain monthly *Thunder Roads* magazine to the layout of portions of Defendant's *Reasons to Ride* magazine. (*Id*.). In addition, Plaintiff has alleged that Defendant put a logo titled "Reasons to Ride" on the *Thunder Roads Ohio* magazines and used Plaintiff's images and logos on his *Reasons to Ride* website and social media accounts. (*Id*. at ¶ 22, 30). Finally, Plaintiff has alleged that Defendant published an advertisement shown in *Thunder Roads Ohio* magazine in his *Reasons to Ride* magazine with the *Thunder Roads Ohio* logo in the corner. (*Id*. at ¶ 36).

According to Plaintiff, these factual allegations (accepted as true for purposes of the instant Motion) establish that Defendant materially breached Section 15 of the Agreement, which states, in pertinent part,

> It is mutually agreed and understood by the parties that Thunder Roads Magazine's name and its' logo are regarded as Registered & Trademark protected entities with the USPTO, and as such, shall not be *infringed* upon by [Defendant], or any of his agents, employees, sponsors, promoters, financial contributors, or the like, except as specifically outlined herein.

(Doc. No. 1-2 at 23) (emphasis added).

Conspicuously absent from the Complaint is a cause of action for trademark or copyright infringement. Indeed, by its own admission, Plaintiff is not pursuing a cause of action for trademark infringement. (Doc. No. 20 at 5). Rather, Plaintiff's sole cause of action relating to these allegations is for breach of contract arising from Defendant's alleged "infringement" of Plaintiff's name and logo purportedly in violation of Section 15 of the Agreement. (*Id*.). However, the term "infringe," which is not defined in the Agreement or in the parties' respective briefs, is a legal term most commonly understood as relating to conduct that would constitute infringement under the

Lanham Act.[18] *See* 15 U.S.C. § 1114. Plaintiff does not allege in its Complaint or argue in its briefing that the parties understood the term "infringe[ ]" to mean something different than the legal meaning that is most commonly attributed to it, particularly in this context. In the absence of such allegations, and given that the term is used specifically in the context of infringement of "entities" registered with and protected by the USPTO, the Court finds that "infringe," as used in the Agreement, unambiguously refers to the legal term for conduct that would constitute infringement under the Lanham Act.

Therefore, to establish that Defendant has breached Section 15 of the Agreement as alleged in the Complaint[19] (i.e., that Defendant has "infringed" on Plaintiff's name and logo), Plaintiff must allege facts that (accepted as true) would be sufficient to show that Defendant has committed trademark infringement in violation of the Lanham Act (or an analogous state law). This is true despite the fact that Plaintiff has not asserted a cause of action for trademark infringement (under federal or state law). To succeed in establishing liability for trademark infringement under the Lanham Act, a plaintiff must prove that "(1) it owns the registered trademark, (2) the defendant

---

[18] The Court recognizes that there is a cause of action for trademark infringement under the law (be it statutory or common law) of various states, although such a state-law action may look like a Lanham Act action. In Tennessee, for example, a cause of action for trademark infringement is prescribed by the Tennessee Trademark Act of 2000 ("Trademark Act"). *See* Tenn. Code Ann. § 47-25-512. "The Trademark Act stipulates that cases interpreting the Lanham Act are persuasive authority for use in interpreting the Trademark Act. As such, courts have applied the Lanham Act standards when evaluating Trademark Act claims." *Kremer v. Reddit, Inc.*, No. 2:21-CV-00038, 2022 WL 3702092 (M.D. Tenn. Aug. 26, 2022), *report and recommendation adopted*, No. 2:21-CV-00038, 2022 WL 4241273 (M.D. Tenn. Sept. 14, 2022) (citing *Kebab Gyros, Inc. v. Riyad*, No. 3:09–0061, 2009 WL 5170194, at *5 (M.D. Tenn. Dec. 17, 2009)) (internal citations omitted).

[19] The Court need not (and does not) decide whether Plaintiff could establish breach of contract by alleging all of the facts necessary to plausibly plead a claim for trademark infringement without actually pleading a claim for trademark infringement as an independent cause of action. The Court assumes arguendo that Plaintiff may do so and then assesses whether Plaintiff has in fact plausibly alleged the facts needed to state a claim for trademark infringement.

used the trademark in commerce, and (3) the use was likely to cause confusion."[20] *Hensley Mfg.*

*v. ProPride, Inc.*, 579 F.3d 603, 609 (6th Cir. 2009) (citing 15 U.S.C. § 1114(1)). Thus, the

question before the Court is whether the Complaint has alleged facts plausibly suggesting that: (1)

Plaintiff owns a trademark that is registered with the United States Patent and Trademark Office

(USPTO) for its name, or its logo, or both; (2) Defendant used at least one such protectable

trademark in commerce, and (3) there was a likelihood of consumer confusion as a result. The

Court finds that the Complaint has not done so.

The Complaint alleges that Defendant used Plaintiff's name and logo in commerce, and

includes depictions of Plaintiff's name and logo on Defendant's magazines, which may give rise

to an inference that there would be a likelihood of consumer confusion.[21] However, the Complaint

does not plausibly allege that Plaintiff's name and logo were registered trademarks.[22]

---

[20] With respect to the third requirement—the likelihood of confusion—the relevant inquiry is whether a defendant's use of the disputed mark is "likely to cause confusion among consumers regarding the origin of the goods offered by the parties." *Hensley*, 579 F.3d at 609.

[21] Although the depictions in the Complaint show Plaintiff's name and logo used on Defendant's magazines and demonstrate similarities in the layout of Plaintiff and Defendant's magazines, the Complaint does not specifically allege the third element of an infringement claim, i.e., that a likelihood of consumer confusion would result from Defendant's alleged use of its name and logo on his magazines. And despite the potential applicability of the above-referenced permissible inference of consumer confusion, it would have behooved Plaintiff to have alleged in the Complaint underlying factual matter that would have supported a finding of likelihood of confusion, which is a concept that turns on numerous case-specific factors. *See Leelanau Wine Cellars, Ltd. v. Black & Red, Inc.*, 502 F.3d 504, 515 (6th Cir. 2007).

However, the Court need not determine whether Plaintiff has plausibly alleged the third element of trademark infringement despite the lack of such a specific allegation, because Plaintiff has clearly failed to allege facts supporting the first element, as discussed below.

[22] It is true that "unregistered marks may receive protection under § 43(a) of the Lanham Act." *Bliss Collection, LLC v. Latham Companies, LLC*, 82 F.4th 499, 506 (6th Cir. 2023) (citing *T. Marzetti Co. v. Roskam Baking Co.*, 680 F.3d 629, 633 (6th Cir. 2012)). However, unregistered marks do not receive "the same presumption of validity that registered trademarks receive." *Id.* (citing *Fuji Kogyo Co. v. Pac. Bay Int'l, Inc.*, 461 F.3d 675, 683 (6th Cir. 2006)). "[W]hen evaluating a Lanham Act claim for infringement of an unregistered mark, courts must determine whether the mark is protectable . . . ." *Tumblebus Inc. v. Cranmer*, 399 F.3d 754, 761 (6th Cir. 2005). For the same reasons it concludes that the Complaint has not

The only portion of the Complaint addressing whether Plaintiff's name and logo are registered as trademarks with the USPTO is in Paragraph 16, wherein the Complaint quotes Section 15 of the Agreement, which states, "[i]t is mutually agreed and understood by the parties that Thunder Roads Magazine's name and its' logo are regarded as Registered & Trademark protected entities with the USPTO . . . ." (Doc. No. 1-2 at ¶ 16). However, this direct quotation of the Agreement merely asserts what the contract between the parties (a copy of which is attached to the Complaint) provides as a way of introducing the portions of the Agreement that are relevant to this lawsuit. To that end, the very next paragraph of the Complaint quotes Section 17 of the Agreement (the Non-Compete), which is the other relevant provision of the Agreement at issue in this case. (*Id*. at ¶ 17). Thus, the Court does not read the Complaint's quoting of Section 15 of the Agreement as alleging the fact that Plaintiff's name and logo are indeed registered and protected trademarks that it owns, but rather as highlighting an excerpt of the Agreement that is relevant to the dispute.[23] In other words, the Complaint makes an allegation (which the Court accepts as true) about what Section 15 says, without making an allegation that any particular fact asserted in Section 15 is actually true or, for that matter, supportive of Plaintiff's claim if true.

Moreover, the Agreement was executed on October 9, 2012, over 10 years before this lawsuit was filed, and at least seven years before Defendant began engaging in conduct that would (according to Plaintiff) infringe Plaintiff's name and logo. Thus, even if Plaintiff's name and logo had been registered at the time the Agreement was signed (which, as noted above, actually is

_____

alleged that Plaintiff's name and logo were "registered" with the USPTO, the Court similarly finds that Plaintiff has not alleged that its name and logo are valid or protectable marks.

[23] At most, Paragraph 16 of the Complaint may be read as an allegation of what the Agreement says in Section 15, and thus, what the parties there agreed to. That, however, is still different from an allegation that any facts alleged in the Agreement (including in Section 15, with respect to whether Plaintiff's name and logo are registered trademarks) are in fact true.

something Plaintiff has not plausibly alleged), Plaintiff has not alleged facts to establish that such registration (if it had ever been issued in the first place) had not expired or been invalidated by the time Defendant allegedly infringed the name and logo. The Complaint contains no allegations that Plaintiff has taken the necessary steps to keep valid its federal trademark registration (if it had ever been registered at all), such as by submitting required affidavits, filings, and fees. *See* 15 U.S.C. § 1058. Nor has Plaintiff alleged that it renewed, at any point, its trademark registration, as is generally required after a period of ten years from the date the registration is first issued. *See* 37 C.F.R. §§ 2.181(2); 2.182-2.183. And a trademark registration is always subject to potential cancellation,[24] and yet Plaintiff does not allege that the registration(s) at issue here had not been cancelled by the time of Defendant's alleged infringement. In sum, Plaintiff has not alleged that its name and logo were registered trademarks at the time Defendant purportedly infringed them (or, for that matter, at any time). Accordingly, Plaintiff has failed to plausibly allege that Defendant breached Section 15 of the Agreement.

<u>CONCLUSION</u>

For the reasons stated herein, the Motion at Doc. No. 16 will be GRANTED. An appropriate corresponding order will be entered.

*Eli Richardson*
ELI  RICHARDSON
UNITED STATES DISTRICT JUDGE

---

[24] *See*, *e.g.*, 15 U.S.C. § 1064 (allowing an aggrieved party to file a petition to cancel a registration of a trademark under certain circumstances, including "at any time if the registered mark becomes the generic name for the goods or services, or a portion thereof, for which it is registered, or is functional, or has been abandoned, or its registration was obtained fraudulently . . . .").